| | | |
|---|---|---|
| **MYSCELLENT CHRISTINA** | ) | |
| **SHELTON-COX,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 3:16-cv-0138** |
| **v.** | ) | **Judge Aleta A. Trauger** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | | |

## MEMORANDUM

Pending before the court is the plaintiff Myscellent Christina Shelton-Cox's Motion for Judgment on the Administrative Record (ECF No. 14), to which the defendant Social Security Administration (SSA) has responded (ECF Nos. 16), and the plaintiff has filed a reply (ECF No. 17). Upon consideration of the parties' briefs and the transcript of the administrative record (ECF No. 10),[1] and for the reasons given herein, the plaintiff's Motion for Judgment on the Administrative Record will be denied and the decision of the SSA will be affirmed.

### I.  Magistrate Judge Referral

To avoid any further delay in the resolution of this matter, the court will VACATE the referral to the magistrate judge.

### II.  Motion for Judgment on the Administrative Record

---

[1] Referenced hereinafter by "Tr." followed by a page number which can be found in bolded font at the lower right corner of the transcript.

The plaintiff filed an application for disability insurance benefits under Title II of the Social Security Act and an application for supplemental security income ("SSI") under Title XVI of the Social Security Act[2] on November 16, 2011, (Tr. 177-80, 181-89), alleging disability onset as of April 30, 2010, (*Id.*), due to mild retardation and learning disabilities. (Tr. 229). The plaintiff subsequently amended the disability onset date to February 14, 2011. (Tr. 60.) The plaintiff's claim to benefits was denied at the initial and reconsideration stages of state agency review. As a result, the plaintiff requested *de novo* review of her case by an Administrative Law Judge (ALJ). The ALJ heard the case on May 27, 2014, when the plaintiff appeared with counsel and gave testimony. (Tr. 57-82.)[3] Testimony was also received from a vocational expert. (*Id.*) At the conclusion of the hearing, the matter was taken under advisement until July 1, 2014, when the ALJ issued a written decision finding that the plaintiff was not disabled. (Tr. 18–45.) That decision contains the following enumerated findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since February 14, 2011, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: Urge Incontinence Disorder, Attention Deficit Hyperactivity Disorder, Major Depressive Disorder, and Borderline Intellectual Functioning (20 CFR 404.1520(c) and 416.920(c)).

---

[2] The Act and implementing regulations regarding Disability Insurance Benefits (contained in Title II of the Act and 20 C.F.R. Part 404 of the regulations) and SSI (contained in Title XVI of the Act and 20 C.F.R. Part 416 of the regulations) are substantially identical. *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003) (noting that the Title II and the Title XVI definition of "disability" is "verbatim the same" and explaining that, "[f]or simplicity sake, we will refer only to the II provisions, but our analysis applies equally to Title XVI.") The court cites to the regulations interchangeably throughout this opinion.

[3] The plaintiff originally appeared at a hearing schedule for December 17, 2013 however. because she was without counsel at the time, the ALJ continued the hearing to give her time to retain counsel and for counsel to prepare the case for hearing. (Tr. 18; *see also* Tr. 49-55.)

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She is limited to jobs where there is no concentrated exposure to pulmonary irritants, and where the claimant requires access to a restroom within the work area. From a mental perspective, the claimant can understand, remember, carry out and maintain attention, concentration, persistence and pace for simple tasks with normal breaks spread throughout the day. In addition, she can interact appropriately with others and adapt to routine changes within this type of work environment.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on August 14, 1976 and was 34 years old, which is defined as a younger individual, age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from February 14, 2011, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 23-24, 29, 36-38.)

On November 30, 2015, the Appeals Council denied the plaintiff's request for review of the ALJ's decision (Tr. 1-6), thereby rendering that decision the final decision of the SSA. This civil action was thereafter timely filed, and the court has jurisdiction. 42 U.S.C. § 405(g). If the

ALJ's findings are supported by substantial evidence based on the record as a whole, then those findings are conclusive.  *Id.*

### A. Review of the Record

The following summary of the medical record is taken from the ALJ's decision:

**Discussion, physical**.   With regard to the claimant's urge incontinence disorder, it is needful to reiterate that her testimony regarding the medical condition factoring into her employment terminations goes to general credibility, since it directly contradicts what she told an evaluator at Ex. IF or mental health professionals at Ex. 2F about such incidents as fighting on the job, sleeping during duty time, and so forth.  Such credibility items do not require belaboring, but it does mean that one must rely more fully on the objective medical evidence in such matters.  Even then, one finds multiple reasons for pause:

- Records from Dr. Swan from February 2011 reflect the claimant's urinary incontinence impairment dates back to childhood, and as such, would be very remote to the point of alleged onset.  In objective testing, the claimant did demonstrate a loss of urine related with an urge at a volume of infusion as low as 180 ml, consistent with her stated symptoms (Ex. 18F at 5).  In March of 2011, it was determined that she had failed medical therapy, so the treatment plan called for the trial of a sacral nerve stimulator, and the same was implanted.

- In a January 2012 office visit, the claimant alleged that the sacral nerve stimulator had never worked; however an interrogation of the unit was within normal limits and it was also determined that there were multiple settings the claimant had not tried; she was shown how to change these in order to optimize the results (Ex. 18F).[4]   There was no further mention of difficulty in Dr. Swan's records until July 2013, with onset of renewed difficulties only two months earlier (*id*.).

  [4] According to the January 18, 2012 treatment notes: "Patient was not feeling stimulation.   Using the physician programmer [it was determined] only program 1 had been used.   I reviewed with the patient how to use the patient programmer.   She was able to turn the amps up to 3.8 and did feel stimulation vaginally.   We also tested program 2 and she did feel stimulation vaginally at 2.5 amps."   (Ex. 18F).

- The claimant's consultative evaluation occurred during the above sequence, in May 2012.  She does not appear to allege genitourinary difficulty at that time, but rather, the complaints were musculoskeletal or pulmonary in nature.  Although this was a limited exam, and the genitourinary system is typically out of scope even with a regular physical exam, it must also be pointed out that she exhibited normal ambulation, and there was no mention of her

needing to interrupt the evaluation at any time secondary to impending or actual loss of bladder control (Ex. 10F).

• Although the impairment is not specific to kidney function, it should also be observed that an ultrasound of the kidneys was normal as of January 2012, and later, kidney function labs in October 2012 were within normal limits as well (Ex. 22F).

• Well woman exam at the Vine Hill Community Clinic (March 2013): In the range of symptoms, no mention of complaints specific to the bladder or genitourinary system, but only mention regarding the absence of menstruation. Female genitourinary exam was unremarkable and included a non-tender bladder (Ex. 22F).

• Well woman exam at the Vine Hill Community Clinic (October 2013): Range of symptoms negative for bladder habits and dysmenorrhea. Unremarkable exam. Urine culture was sent off; however, there were no reports of abnormalities associated with the culture (Ex. 22F).

• One finds no significant information regarding genitourinary complaints following July 2013.

The picture that emerges is one where the claimant indeed has a severe impairment involving her urge incontinence disorder. However, the treatment evidence also indicates that the use of a sacral nerve stimulator was useful in controlling symptoms once the claimant learned how to program it correctly according to the treating physician's instructions. Thus, the weight of the evidence indicates that although the claimant would need access to a restroom within the work area, she would not have episodes of a frequency or magnitude as was alleged, in the setting of such treatment.

\* \* \*

**Discussion, mental**. With regard to the claimant's alleged borderline intellectual functioning, . . . it suffices to say that the claimant's robust activities of daily living-with a correspondingly high level of adaptive functioning-are clearly inconsistent with the notion that the impairment was severe enough to prevent simple and unskilled work. Again, one finds a number of inconsistencies that call into question the accuracy of her cognitive measurements from both 2011 and 2014.

Although one may suppose that the 1994 cognitive assessment at Ex. 15E would be limited in its probative value in relation to her current level of functioning, it remains highly relevant for three purposes. First, the assessment stands for the proposition that at all times during the period in question, the claimant's borderline intellectual functioning was medically determinable, since it appears to be the only one where the validity of the scores is not terribly subject to question.

Second, the claimant's performance or processing speed indices were consistently in the 70's over all WAIS administrations, consistent with a finding that the claimant has the impairment. However, third, one does not find a reasonable explanation as to how it was the claimant achieved high-borderline indices as far as the full-scale or verbal components were concerned (which had been 78 and 81, respectively), yet scored one or more standard deviations below that in her 2011 and 2014 evaluations (which were both 63 as to the 2014 evaluation).

Ultimately, the claimant's borderline intellectual functioning results in a limitation in favor of simple and unskilled work. However, because of the substantial doubts that were raised by the last two WAIS administrations, together with the other objective evidence . . ., together with the claimant's activities of daily living, the weight of the evidence did not support a finding of greater functional limitations by virtue of this impairment.

Attention turns to the claimant's remaining severe mental impairments, one finds reason to doubt the veracity of her subjective allegations. To summarize significant items from the medical evidence:

- Centerstone (intake: December 2008, termination: January 2010)(Ex. 1F)
  - o Entire interval prior to alleged onset date
  - o Did not resume treatment until intake on March 11, 2011, just after the alleged onset date, and more than a year after termination
  - o She reports that she has worked in security and is licensed to carry a gun (this, in turn, is certainly inconsistent with someone who also alleges intellectual disability)
  - o Was noted at the time as friendly, cooperative, open and attentive

- Centerstone (March-August 2011, formal termination: December 2011) (Ex. 3F)
  - o In April 2011 psychiatric evaluation:
    - Reports graduating with special education diploma and is currently taking classes towards her GED (see p. 70)
    - Mental status exam largely unremarkable with euthymic mood, average intelligence, intact judgement
    - ADHD was the only diagnosis at the time; however, it goes on to say that the basis for the diagnosis was unclear
    - GAF score of 60

  - o May 2011: Medical management: Unremarkable mental status; reports feeling okay but wants something for distractibility; treatment plan called for Wellbutrin XL
  - o June 2011: Medical management: Reports doing fine, with improved concentration since starting Wellbutrin XL; unremarkable mental status
  - o July 2011: Report of motor vehicle accident; however, the claimant went on to say that she would not allow this to ruin her day like similar events have done in the past

o August 2, 2011: Looking for employment; attending church; is looking into selling Mary Kay cosmetics
o August 16, 2011(medical management):
  • Endorsed depressive symptoms; however, again, an unremarkable mental status
  • No change in GAF score
  • Treatment plan called for increasing dose of Wellbutrin
o August 16, 2011(therapy notes): Went on a limo ride with her children, boyfriend and sister
o No evidence of her return to Centerstone after August 2011; discharge report dated December 2011

\* \* \*

• Vine Hill Community Clinic, January 2012-December 2013 (Ex. 22F)
  o September 2012: No psychiatric symptoms included as part of her range of symptoms
  o March 2013: Endorsed depressive symptoms, but does not take medication for depression (at this point, no evidence to indicate ongoing treatment); unremarkable mental status at time of exam
  o October 2013: Not present: Anxiety and depression; unremarkable mental status on exam (oriented in all spheres, articulate with good reasoning, memory and judgment, no delusions or hallucinations)

\* \* \*

She was taking classes towards her GED credential according to multiple mental health treatment records (Ex. 1F, 3F). Treatment records at Centerstone include Global Assessment of Functioning (GAF) measurements that were consistently at or above 51 during nearly the entire period in question, consistent with someone having, at worst, no more than moderate limitation of mental functioning ( see, e.g., Ex. 14F at 1, 105, April 2011: 60; 3F at 19, 23, same).

Compliance with actually attending treatment sessions has been an issue (see, e.g., Ex. 3F at 8-10, 21-22, 25-30). These records also include significant social activities (including but not limited to a relationship with a boyfriend, looking for employment, and an interest in selling Mary Kay cosmetics). The last of her treatment notes, dated August 16, 2011, say that the claimant had been taking a limousine ride in her local area for her birthday, which she shared with family and friends (Ex. 3F at 11). There is no evidence of treatment from any mental health provider since then, which means that it was only during a small portion of the interval since alleged onset where the claimant received treatment at all. It is also interesting to note that if one turns to the neuropsychiatric evaluation at Ex. 24F, evaluating clinicians concluded that objectively speaking, she did not meet the diagnostic criteria for any impairment, save for borderline intellectual functioning (p. 8). . . .

The picture that emerges from all of the foregoing is fundamentally inconsistent with a finding that she has additional limitations above or beyond those adopted into the above residual functional capacity.

(Tr. 30-31, 33–35.)

## B. Conclusions of Law

### 1. Standard of Review

This court reviews the final decision of the SSA to determine whether substantial evidence supports that agency's findings and whether it applied the correct legal standards. *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 833 (6th Cir. 2016). Substantial evidence means "'more than a mere scintilla' but less than a preponderance; substantial evidence is such 'relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). In determining whether substantial evidence supports the agency's findings, a court must examine the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984)). The agency's decision must stand if substantial evidence supports it, even if the record contains evidence supporting the opposite conclusion. *See Hernandez v. Comm'r of Soc. Sec.*, 644 F. App'x 468, 473 (6th Cir. 2016) (citing *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

Accordingly, this court may not "try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). Where, however, an ALJ fails to follow agency rules and regulations, the decision lacks the support of substantial evidence, "even where the conclusion of the ALJ may be justified based upon the record." *Miller*, 811 F.3d at 833 (quoting *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014)).

## 2. The Five-Step Inquiry

The claimant bears the ultimate burden of establishing an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's "physical or mental impairment" must "result[] from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3). The SSA considers a claimant's case under a five-step sequential evaluation process, described by the Sixth Circuit Court of Appeals as follows:

1) A claimant who is engaging in substantial gainful activity will not be found to be disabled regardless of medical findings.

2) A claimant who does not have a severe impairment will not be found to be disabled.

3) A finding of disability will be made without consideration of vocational factors, if a claimant is not working and is suffering from a severe impairment which meets the duration requirement and which meets or equals a listed impairment in Appendix 1 to Subpart P of the Regulations. Claimants with lesser impairments proceed to step four.

4) A claimant who can perform work that he has done in the past will not be found to be disabled.

5) If a claimant cannot perform his past work, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed.

*Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (citing *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007)); 20 C.F.R. §§ 404.1520, 416.920. The claimant bears the burden through step four of proving the existence and severity of the limitations his impairments cause and the fact that he cannot perform past relevant work; however, at step five, "the burden shifts to the Commissioner to 'identify a significant number of jobs in the economy

that accommodate the claimant's residual functional capacity . . . ." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628 (6th Cir. 2016) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)).

The SSA can carry its burden at the fifth step of the evaluation process by relying on the Medical-Vocational Guidelines, otherwise known as "the grids," but only if a nonexertional impairment does not significantly limit the claimant, and then only when the claimant's characteristics precisely match the characteristics of the applicable grid rule. *See Anderson v. Comm'r of Soc. Sec.*, 406 F. App'x 32, 35 (6th Cir. 2010); *Wright v. Massanari*, 321 F.3d 611, 615–16 (6th Cir. 2003). Otherwise, the grids only function as a guide to the disability determination. *Wright*, 321 F.3d at 615–16; *see also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990). Where the grids do not direct a conclusion as to the claimant's disability, the SSA must rebut the claimant's *prima facie* case by coming forward with proof of the claimant's individual vocational qualifications to perform specific jobs, typically through vocational expert testimony. *Anderson*, 406 F. App'x at 35; *see Wright*, 321 F.3d at 616 (quoting SSR 83-12, 1983 WL 31253, *4 (Jan. 1, 1983)).

When determining a claimant's residual functional capacity (RFC) at steps four and five, the SSA must consider the combined effect of all the claimant's impairments, mental and physical, exertional and nonexertional, severe and nonsevere. *See* 42 U.S.C. §§ 423(d)(2)(B), (5)(B); *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 499 (6th Cir. 2014) (citing 20 C.F.R. § 404.1545(e)).

### 3. The Plaintiff's Statement of Errors

As her first claim of error, the plaintiff argues that the ALJ failed to state how much weight she assigned to the opinion of Elliot Ward, Ph.D., a state agency consultative psychological examiner.

Social security regulations and rulings establish the framework for the ALJ's consideration of medical opinions. *See* 20 C.F.R. §§ 404.1527, 416.927; SSR 96-2p. Acceptable medical sources[4] are divided into three categories: treating sources, examining but non-treating sources; and non-examining sources. *Id.* A treating source "means your own acceptable medical source who provides you, or has provided you, with medical treatment or evaluation" consistent with accepted medical practice, and "who has, or has had, an ongoing treatment relationship with you." 20 C.F.R. § 404.1527. An examining, but "nontreating source . . . has examined the claimant but does not have, or did not have, an ongoing treatment relationship with her." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (internal citation and quotation marks omitted). A "nonexamining source is a physician, psychologist, or other acceptable medical source who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." *Id.* (internal citation and quotations marks omitted).

The SSA is only required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010) (internal citation omitted). The Sixth Circuit has long held that the "the regulation requiring an ALJ to provide 'good reasons for the weight given a treating physician's opinion does not apply to an ALJ's failure to explain his favoring of one non-treating source's opinion over another." *Wright v. Colvin*, No. 1:15-cv-01931, 2016 WL 5661595, at *9 (N.D. Ohio Sept. 30, 2016) (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 506-07 (6th Cir. 2006). As long as "the ALJ's decision adequately explains and

---

[4] "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. 20 C.F.R. § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. 20 C.F.R. § 404.1513(d).

justifies its determination as a whole, it satisfies the necessary requirements. . . ." *Norris Comm'r of Soc. Sec.*, 461 F.App'x 433, 440 (6th Cir. 2012).

The ALJ discussed Dr. Ward's opinion throughout her decision. The ALJ relied on Dr. Ward's opinion in concluding that borderline intellectual functioning was a medically determinable severe impairment. (Tr. 23, *see also* 412, 1132.) The ALJ relied on Dr. Ward's opinion in determining that the plaintiff's impairment did not meet the criteria for the intellectual disorder listing at §12.05. (Tr. 27-29.) The ALJ also noted that Dr. Ward "expressly opined against intellectual disability and in favor of borderline intellectual functioning, . . . because [of the plaintiff's] level of adaptive functioning . . . ." (Tr. 26, *see also* Tr. 1131-32.) Finally, the ALJ relied on Dr. Ward's opinion in determining that the plaintiff did not satisfy the "paragraph B" criteria for the neurocognitive disorder listing at §12.02 or the depressive, bipolar and related disorder listing at §12.04. (Tr. 27-28.)

To satisfy the "Paragraph B" criteria the plaintiff's mental impairment must result in marked restrictions in at least two areas of functioning or repeated, and extended, periods of decompensation. (Tr. 27.) Based on Dr. Ward's opinion the ALJ found that the claimant had only mild restrictions in her activities of daily living, mild difficulties in social functioning, moderate difficulties with concentration, persistence and pace, and no episodes of decompensation. (Tr. 28.) Indeed, as Dr. Ward noted, the plaintiff engaged in a "robust" level of activities of daily living including:

> Routine Chores: washing dishes, cleaning the kitchen, making beds, cleaning the bedroom, cleaning the bathroom, sweeping, mopping, dusting, taking out the trash, washing clothes, preparing meals, taking care of children, managing household money, and grocery shopping. Social Activities: socializing with friends, talking with friends on the phone, eating out in restaurants, attending religious services, and going out to the movies. Individual Activities: watching TV and exercising

(Tr. 25, *see also* 1126.)  With respect to the plaintiff's social functioning, Dr. Ward noted that, although the plaintiff complained of having difficulty with anger management and frustration tolerance, she exhibited "no difficulty with motivation, social skills, social appropriateness or cooperation, [nor did she have] functional difficulties with depression, anger, anxiety, frustration, agitation, hypomania, impulsivity, paranoid thoughts, or hallucinations."  (Tr. 28, *see also* Tr. 1132.)  Finally, with regard to the plaintiff's concentration, persistence or pace, Dr. Ward "concluded that the [plaintiff] did not meet the diagnostic criteria for a medically determinable attention disorder such as ADHD, and  . . . did not have significant difficulty with attention, focus, concentration or alertness."  (Tr. 28; *see also* Tr. 1132.)

Turning to the mental health evidence supporting the RFC, the ALJ again noted that, in his report, Dr. Ward found that the plaintiff had "no functional difficulties with depression, anger, frustration, agitation, hypomania, impulsivity, paranoid thoughts or hallucination."

 (Tr. 35; *see also* 1132.)  Dr. Ward found that the plaintiff "did not meet the diagnostic criteria for any impairment besides borderline intellection functioning, despite allegations involving depression, generalized anxiety and P[ost] T[raumatic] S[tress] D]isorder]."  (*Id.*)  Additionally, Dr. Ward found that the plaintiff's "behavior in the area of social task management indicated no difficulties with motivation, social skills, social appropriateness, or cooperation" and only "moderate difficulties with communication skills."  (*Id.*)  Finally, Dr. Ward found that "in the domain of cognitive task management, she was observed to have no difficulty with alertness [or] focus" during the interview or testing process, she had no difficulties with logical thought, with following directions, with time management or work speed and she had only moderate difficulties with understanding directions.  (Tr. 1132.)

While the ALJ never expressly stated the amount of weight she gave to Dr. Ward's opinion, it is obvious to even a casual reader that the ALJ substantially relied on Dr. Ward's

opinion in preparing her decision.  The ALJ adequately explained the significance of Dr. Ward's opinion.

As her second claim of error, the plaintiff argues that the ALJ's decision contains numerous inaccurate statements which are not consistent with the evidence of record.  In her decision, the ALJ included a "preface as to general credibility" in which the ALJ listed ten areas of inconsistency that undermined the plaintiff's credibility**.**  The plaintiff argues that the ALJ came to mistaken conclusions regarding each of the ten areas of inconsistency.

In the first inconsistency, the ALJ noted that the plaintiff testified at the hearing that she was fired from jobs because she had to use the restroom excessively. (Tr. 21; *see also*  Tr. 72-73.)  However, at her July 2011 consultative evaluation, the plaintiff stated that she was fired from one job for fighting, that she was fired from a second job because she did not report to work during a tornado warning, and that she was terminated from two other jobs because she fell asleep during work hours.  (Tr. 409). Similarly, she told providers at Centerstone that she was fired from multiple jobs for sleeping on the job.  (Tr. 336.)  The plaintiff contends that her testimony was not inconsistent with the statements she made during the consultative evaluation or to the Centerstone provider.  The plaintiff explains that, because the July 2011 evaluation was a consultative mental health evaluation rather than a physical evaluation, she may not have revealed that she got fired for excessive use of the bathroom.  Additionally, the plaintiff suggests that her testimony and statements are not inconsistent because she might have been fired from jobs for each of the reasons she stated.  While the plaintiff may indeed have declined to reveal an embarrassing fact, like being fired for excessive restroom use, or may have been fired for each of the reasons she mentioned, the fact remains that although she told the consultative examiner that she was fired for a variety of reasons and told the Centerstone provider she was fired for sleeping on the job, she testified only that she was fired for excessive bathroom use.  This fact, consistent

with the ALJ's finding, suggests that the plaintiff was attempting to bolster her claim that she could not work at all because of her problems with urinary incontinence, where the other evidence of record suggested that the plaintiff had trouble working for a variety of reasons, few, if any, of which would render her disabled. The ALJ did not err in her characterization of the inconsistences between the plaintiff's testimony and other evidence in the record.

With regard to the second inconsistency, the plaintiff claims that the ALJ deliberately mischaracterized her testimony regarding whether she was licensed, and how she obtained a license, to carry a firearm in connection with her job as a security guard in order to make it appear that the plaintiff was withholding information. The plaintiff claims that she testified that her employer ran a background check and gave her literature to go over regarding carrying a gun and that, at the hearing, she admitted that she was licensed to carry a gun. The plaintiff asserts that the ALJ "twisted" her testimony "in a way to decrease the [p]laintiff's credibility." (ECF No. 15 at Page ID# 1206.) Yet, it is the plaintiff's claim, and not the ALJ's characterization of the plaintiff's testimony, that twists the facts.

The following colloquy took place at the hearing. The ALJ asked:

Q     Okay. So describe for me what type of security work you've done.

A     Well I've like just walked around, just like I monitored property.

Q     Did you carry a weapon on any of these jobs?

A     No .

(Tr. 63.)

Later in the hearing, after her attorney had questioned her, the ALJ stated:

Q.     Okay. Ms. Shelton-Cox, I just had a question going back through my review of the records. Have you ever been licensed to carry a gun?

A     I have.

Q     Okay. What do you have to do to be licensed to carry a gun?

15

A       Just because I had a security guard license I just -- I don't have a criminal record.

Q       Okay, do you have to take a test or did you have to do any kind of firearms training, what did you have to do?

A       Nobody gave me a test.  They just ran and I didn't have criminal background.

Q       Did you ever - -

A       I haven't been to jail or anything.

Q       Did, and did you ever actually carry a firearm on any of you jobs?

A       I started out but then I decided that it, that that's not for me.

Q       Okay, so --

A       It wasn't --

Q       --you started out, did you actually carry a weapon in any of your jobs?

A       Yes, I have

(Tr. 74.)

Still later in the hearing, when the ALJ asked the VE whether the fact that the plaintiff had carried a gun in connection with her job as a security guard would change the classification of the job, the VE responded that the classification would remain the same but stated:

> To my knowledge working with security systems that place people at different places they, if they do have a gun like at a bank, in a bank situation or something like that, then if they are not a convicted felon they can carry a firearm. But now I would think they'd have some kind of test, a shooting range test or something.

(Tr. 75.)  Afterwhich the ALJ asked the plaintiff:

Q       Did you ever --

A       I have shot at the range before.

Q      Did you ever have to take any kind of course work, did you have a book to learn or anything else that you had to learn about the regulations on carrying a firearm?  Rules to have a firearm?

A      They did give me literature.

Q      Okay.  And did you have to show that you understood the literature, did you have to take a test or did you have to explain to somebody that you understood the rules about carrying a firearm?

A      They, like they gave me literature and they actually went over the literature with me.  So I actually had help.

(Tr. 75.)   As is manifest, the ALJ's characterization of the plaintiff's testimony was accurate and she did not err in finding that the plaintiff's testimony at the hearing undermined her credibility because it was less than forthcoming.

The third and fifth through ninth inconsistencies relate to observations made by Bobbie L. Hand, M.S., Senior Psychological Examiner, and endorsed by Kathryn B. Sherrod, Ph.D., in the consultative examination report from the examination of the plaintiff which took place on July 19, 2011.  (Tr. 407-412.)  The plaintiff essentially complains that the ALJ mischaracterized various statements Ms. Hand made in her report to support the ALJ's finding that the plaintiff was not wholly credible.  The plaintiff complains that the ALJ noted that Ms. Hand reported that although she alleged back pain, the plaintiff's "gait was observed to be unremarkable and she sat and stood with ease.  She did not shift positions in her seat uncomfortably as do people who are in pain. She did not exhibit any overt symptoms of pain during this evaluation."  (Tr. 409.)  Ms. Hand appears to have questioned whether the plaintiff's back actually hurt given the absence of any signs of pain.  The ALJ accurately reported what Ms. Hand wrote in her report.

The plaintiff complains that, while the ALJ noted that Ms. Hand expressly questioned the validity of scores obtained during cognitive testing because the plaintiff "tended to work rather quickly and carelessly on testing tasks. She also tended to give up quickly," (Tr. 410), the ALJ did not note that Ms. Hand also found that the plaintiff attempted to present herself in "an

unusually positive light" and did not claim too many unreasonable symptoms when given the Lie and Frequency scales from the MMPI-2.[5] (*Id.*; *see also* ECF No. 15 at Page ID)  The plaintiff argues that the ALJ failed to recognize that Ms. Hand's statements demonstrate "the opposite of malingering or exaggerating [of] symptoms."  (ECF No. 15 at Page ID## 1206-07.)  However, the plaintiff conflates Ms. Hand's observations regarding her performance on *cognitive testing* with her performance on *personality testing*.  The ALJ accurately noted that Ms. Hand questioned the validity of cognitive testing because of the plaintiff's poor effort.  Ms. Hand's remarks regarding the plaintiff's performance on cognitive testing undermines the plaintiff's claim that she suffers from an intellectual development disorder.  The ALJ did not comment on Ms. Hand's observations regarding the plaintiff's performance on personality tests because it was not relevant to the point the ALJ was trying to make.  She did not mischaracterize the inconsistency between the plaintiff's claimed disability and Ms. Hand's observations.

The plaintiff complains that the ALJ noted that Ms. Hand questioned the validity of the plaintiff's results on achievement testing because although the plaintiff was unable to read a simple word such as "grunt," she could read much more complex words such as "residence, privilege, and miscellaneous" and because the plaintiff "completed . . . five pages of background paperwork unassisted, which requires about a fifth grade reading level too fully complete[, while her] reading scores were only at the third to fourth grade level on the test."  (Tr. 411.)  Again, the ALJ accurately reported Ms. Hand's observations and noted that her observations undermined the plaintiff's claim that she suffered from an intellectual development disorder.

---

[5] MMPI-2 stands for the Minnesota Multiphasic Personality Inventory-2.  See MMPI-2, Pearson, Clinical Psychology located at
http://www.pearsonclinical.com/psychology/products/100000461/minnesota-multiphasic-personality-inventory-2-mmpi-2.html  (last visited on Aug. 30, 2017).

The plaintiff complains that the ALJ noted Ms. Hand's observations that the results of the Bender Gestalt Test indicate the presence of deficient visual-motor skills, however the plaintiff "did not appear to exert sufficient effort and made careless errors [so] this conclusion cannot be made." (*Id.*) Moreover, the ALJ noted that such results are also inconsistent with the claimant's documented activities such as being licensed to carry a gun and being able to operate a motor vehicle. The plaintiff argues that the ALJ "is essentially . . . attack[ing] . . . the [p]laintiff's previous employer's practice that allowed her to carry a gun [because] [t]he [p]laintiff did not go out on her own and seek licensure to carry a gun." (ECF. No. 15 at Page ID # 1207.) Additionally, the plaintiff suggests that because "the inability [to drive a car] is not a requirement to meet a Listing or to be approved for disability benefits," (*id.*), the ALJ mischaracterized these activities to bolster her finding that the plaintiff was not wholly credible. The ALJ noted Ms. Hand's observation, and observed herself that activities undertaken by the plaintiff were inconsistent with impaired visual-motor skills. The ALJ did not use this information to determine whether the plaintiff satisfied a Listing, nor did she use this information to determine whether the plaintiff was disabled. Rather, the ALJ accurately noted this information to support her finding that the plaintiff's allegations regarding the extent of her intellectual deficits were not fully credible. Further, it bears noting that nothing in the transcript suggests that the plaintiff's employer required her to obtain a license to carry a gun, rather than the plaintiff seeking a license to carry a gun to expand her opportunities for employment.

The plaintiff complains that the ALJ noted Ms. Hand's observations regarding the plaintiff's non-compliance with taking her prescribed medication in support of her finding that the plaintiff was not wholly credible. She complains that the ALJ failed to review other records that showed that the plaintiff was compliant with her medication, except for during a four-week period when the pharmacy erred in filling the plaintiff's prescription and failed to consider that

the plaintiff may have routinely taken more than one medication. Once again, the ALJ accurately recorded Ms. Hand's observations and the plaintiff's complaints miss the mark. Even assuming that the record evidence reflected that the plaintiff was fully compliant with her medication and that the plaintiff was prescribed more than one medication, the ALJ did not err in noting this inconsistency. The issue is not what the plaintiff actually did—whether she took her medicine or not—the issue is what she told Ms. Hand and whether her remarks were accurate. As is plain, the plaintiff's remarks were not accurate. The plaintiff told Ms. Hand that she had taken her Bupropion XL medication that morning, but then later showed Ms. Hand an empty bottle of her prescribed medication, Bupropion XL, dated May 31, 2011, almost two months prior to the consultative examination, explaining that she had not yet filled July's prescription. (Tr. 407.) This suggess, as Ms. Hand noted, that the plaintiff's statement that she took the Bupropion XL the morning of the examination was false. Likewise, the plaintiff told Ms. Hand that "she is currently prescribed 'Bupropion XL' but reported that she has not taken the medication consistently 'because I didn't want to be on medicine.'" (Tr. 408.) The plaintiff's statement itself undermines any suggestion that she is compliant with her medication or that she routinely takes more than one medication. The ALJ did not err in noting this inconsistency.

The plaintiff complains that the ALJ failed to note the plaintiff's difficulties with social interaction and socially appropriate behavior, but did note Ms. Hand's observation that the plaintiff initially told Ms. Hand that she does not have any friends, but "moments later" commented that "I have associates I talk to." (Tr. 409.) As with the plaintiff's other complaints, this one misses the mark. Whether the plaintiff struggles with acting in a socially appropriate manner or has difficulties in social settings, is beside the point. The ALJ's focus was on the accuracy of the remarks the plaintiff made to Ms. Hand. In this instance, the plaintiff spoke and

then contradicted herself moments later. The ALJ did not err in considering this fact when assessing the plaintiff's credibility.[6]

With respect to the fourth inconsistency, the ALJ observed that "at the physical consultative evaluation, Woodrow Wilson, M.D. expressly questioned the [plaintiff's] level of effort during range of motion testing, even to the point of concluding there was symptom magnification." (Tr. 21; *see also* Tr. 751.) The plaintiff complains that although the ALJ noted that Dr. Wilson questioned her level of effort and raised the possibility of symptom magnification, the ALJ did not note that Dr. Wilson stated that the plaintiff was "cooperative with the examination." The ALJ did not mischaracterize Dr. Wilson's finding. (*See* Tr. 751 (stating that "I am not sure she is giving real good effort on range of motion testing. She seems to be magnifying her symptoms.") Moreover, that the plaintiff was cooperative, meaning she was willing to comply with Dr. Wilson's requests during the examination, says nothing about the level of effort she gave in complying with those requests. The ALJ did not mischaracterize Dr. Wilson's observations.

With respect to the tenth inconsistency, the plaintiff complains that the ALJ focused on inconsistencies in Dr. Ward's report regarding the plaintiff's cognitive testing, but failed to acknowledge the consistencies that also existed. The ALJ accurately noted that in his consultative evaluation report, Dr. Ward stated that the plaintiff's IQ score of 63 showed extremely low functioning, while her adaptive behavior test results, which generated a score of

---

[6] The record evidence suggests that the plaintiff had a rather robust social life. The plaintiff had a boyfriend (Tr. 334-36, 838, 842) ), on one of her birthdays she took her boyfriend, children, sister and sister's toddler on a limousine ride to celebrate (Tr. 427), she went camping with a new group of friends (Tr. 387), she goes to church every Sunday (Tr. 409, 431), she eats out at restaurants (Tr. 1126), she leans on a friend for support (Tr. 330) and she visits her relatives twice a month (Tr. 409.). Moreover, although she testified that she does not go to the movies because she cannot make it through an entire film without having to use the bathroom, (Tr. 65), the plaintiff told Ms. Hand that "she goes to [the] movies once a month (Tr. 409, *see also* Tr. 1126 (telling Dr. Ward she goes out to the movies).

54, showed low average functioning, which Dr. Ward noted, represented a difference of more than one standard deviation. (Tr. 1131.) Thus, Dr. Ward explained that the results of the plaintiff's testing did not satisfy the "necessary criterion to make the diagnosis of intellectual development disorder." (*Id.*) The ALJ accurately recorded Dr. Ward's analysis, doing so for the purpose of establishing the inconsistency between the plaintiff's allegations of a significant intellectual disability and Dr. Ward's diagnosis of borderline intellectual functioning. The consistency of other testing results is irrelevant to the point the ALJ was trying to make.

As her third claim of error, the plaintiff argues that the ALJ erred by failing to give sufficient weight to the opinion of the plaintiff's treating physician, Michael Swan, M.D.

The ALJ is generally required to accord the opinion of a claimant's treating physician substantial deference. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). Such deference, however, is due only when a treating physician's opinion is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" before the ALJ. 20 C.F.R. § 404.1527(c) (2). The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton*, 246 F.3d at 773. An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight. *See Young v. Sec'y of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Comm'r Soc. Sec. Admin*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all."). Ultimately, the determination of disability is "the prerogative of the Commissioner, not the treating physician." *Warner*, 375 F.3d at 390 (quoting *Harris v. Heckler*, 726 F.2d 431, 435 (6th Cir. 1985)). As such, a treating physician's opinion that a patient is disabled is not entitled to any special significance. See 20 C.F.R. §§ 404.1527(d)(1), (3),

416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 980 n. 1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician.").

If the ALJ decides not to accord the opinion of a treating physician controlling weight, the ALJ relies on a number of factors—including the length of the treatment relationship and frequency of evaluation, the nature and extent of the treatment relationship, how well supported by medical evidence the treating physician's opinion is, the consistency of the treating physician's opinion with the record as a whole, and whether the treating physician is a specialist—to determine how much weight to give the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2)-(6). Where the ALJ finds that the treating physician's opinion is not entitled to controlling weight, the regulations require the ALJ to give "good reasons" for the weight given to a treating source's opinion. 20 C.F.R. § 404.1527(c)(2). Consequently, a decision denying benefits has to state "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 1996 WL 374188 at *5 (1996). This procedural safeguard "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544.

Although courts prefer that they do so, ALJs need not explicitly mention in their decisions every factor under 20 C.F.R. § 404.1527(c) when determining the weight to give the opinion of a treating physician. *See Adams v. Astrue*, No. 1:07-cv-2543, 2008 WL 9396450, at *3, fn. 5 (citing *Thacker v. Comm'r of Soc. Sec.*, 99 Fed. App'x 661, 665 (6th Cir. 2004)). Nevertheless, ALJs must still conduct an analysis sufficient for the court to engage in a

"meaningful review of the ALJ's application of the [treating physician] rule." *Wilson*, 378 F.3d at 544.

The ALJ found that Dr. Swan's opinion was not entitled to controlling weight. The ALJ noted that Dr. Swan opined that the plaintiff:

> is physically unable to sustain work secondary to the urinary incontinence disorder. He added that the claimant would need to urinate every 30 minutes; despite this, she would also be incontinent on the order of 4-6 times per day. He further opined that the claimant could not walk even a single city block without stopping, cannot sit for longer than 20 minutes at a time, cannot stand for longer than 20 minutes at a time, and will be required to spend up to 33% of her working hours inside of a restroom (based on: 7-8 restroom breaks per day, 15-20 minutes per break).

(Tr. 31.) Consistent with SSR 96-2p, which prohibits the ALJ from relying on a medical opinion that is unreasonable and prohibits the ALJ from giving controlling weight to a medical opinion that is not properly supported, the ALJ found that there was no reasonable basis for Dr. Swan's opinion. The ALJ noted that the evidence suggested that the plaintiff's urge incontinence had improved following Dr. Swan's implantation of a sacral nerve stimulator, once the plaintiff was taught how to use the device, and because the plaintiff's robust level of activities of daily living contradicted Dr. Swan's opinion that the plaintiff could not walk even short distances and that she would require frequent restroom breaks, but would, nevertheless, soil her clothing 3 to 4 times a day. (Tr. 31-32.) Moreover, the ALJ noted that although Dr. Swan's opinion is dated January 2014, there is no evidence that he treated the plaintiff after July 2013, and "therefore, Dr. Swan does not have a reasonable basis to opine regarding her *current* limitations." (Tr. 32 (emphasis in original.)

The ALJ also found that Dr. Swan's opinion was internally inconsistent. She noted that Dr. Swan opined that the plaintiff can rarely lift or carry less than 10 lbs., but he also opined that she could occasionally lift and carry 10 lbs. (Tr. 32; *see also* Tr. 1123.) Dr. Swan opined that the plaintiff will need to use the restroom 7-8 times in an 8-hour shift and that she will be away

from her work station for 15-20 minutes in connection with each restroom visit, nevertheless he opined that the plaintiff would never be absent from work because of her impairment.  (Tr. 32; *see also* Tr. 1123-24.)  Finally, the ALJ noted that Dr. Swan opined that the plaintiff could be expected to be "off task" no less than 15% of the work day because of problems with attention and concentration, yet also opined that the plaintiff is capable of tolerating "low stress jobs." (Tr. 32; *see also* Tr. 1123.)

Lastly, the ALJ found that Dr. Swan largely relied on the plaintiff's subjective complaints, and was not qualified to render, as he did, any opinion regarding the plaintiff's mental health.  (Tr. 32.)    For all of these reasons, the ALJ concluded that Dr. Swan's opinion was not entitled to significant weight.

The ALJ also considered a separate, undated letter written by Dr. Swan and received into the SSA electronic folder on May 12, 2014.  In this letter, addressed to "whom it may concern" and not specifically to the SSA, Dr. Swan stated:

> I am writing this letter to inform you that Myscellent Shelton-Cox is currently under my care.  She has a condition involving her bladder symptoms that include leaking of urine, urgency to go to the bathroom, and frequency.  It is hard for her to go through her whole day, whether it may be a long time (eight hour period) or shorter to not have easy access to using the bathroom.  Please excuse her as needed so she can handle this issue.

(Tr. 32; *see also* Tr. 1137.)  The ALJ found that "a number of the same concerns" raised with respect to Dr. Swan's opinion, were equally applicable to Dr. Swan's letter, "including but not limited to evidence regarding the [plaintiff's] responsiveness to treatment . . ., and the lack of evidence regarding treatment by Dr. Swan [after] July 2013."  (Tr. 32.)  The ALJ also noted that "the letter seemed to be for a different purpose, . . .  than these proceedings, as it was designed to excuse the claimant from work or school and did not present the [plaintiff's functional] limitations."  (*Id.*)  As a result, the ALJ concluded that Dr. Swan's letter was not entitled to significant weight.  The ALJ did not err in concluding that neither Dr. Swan's opinion nor his

letter were entitled to significant weight. The ALJ amply explained her reasoning and substantial evidence supports her conclusion.

As her fourth claim of error, the plaintiff argues that the ALJ erred in applying a double standard when evaluating the opinions of non-treating and even non-examining physicians versus the opinion of treating source, Dr. Swan. Specifically, the plaintiff argues that ALJ more closely scrutinized Dr. Swan's opinion then she did the opinions of non-treating and non-examining sources.

As noted above, social security rules and regulations obligated the ALJ to set forth in some detail her reasons for not according Dr. Swan's opinion controlling weight. The plaintiff seems to suggest that perhaps the ALJ did too good of a job in setting forth her reasoning, because the plaintiff now complains that she unfairly scrutinized Dr. Swan's opinion. The ALJ properly reviewed Dr. Swan's opinion, and letter, and set forth, as she was required to do, her reasons for not giving it controlling weight.

With respect to the opinions of the non-treating and non-examining state agency consultants, the ALJ was not required to set forth in the same level of detail, her reasons for favoring these opinions over Dr. Swan's. The ALJ made clear that she gave great weight to the state agency consultant's opinions because they "bear[ ] the greatest consistency with the medical evidence of record as a whole." (Tr. 36.)

The ALJ did not err in her consideration of opinion evidence. Substantial evidence supported her determination that the opinions of the state agency medical consultants were entitled to more weight than the opinion of Dr. Swan.

As her fifth and final claim of error, the plaintiff argues that the ALJ erred by not properly evaluating her credulity as required by SSR 96-7p. Specifically, the plaintiff argues that

the ALJ made only conclusory statements regarding the plaintiff's credibility in violation of SSR 96-7p.

An ALJ is required to follow a two-step process when evaluating an individual's subjective complaints. First, the ALJ must determine whether the individual has an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the individual's symptoms. 20 C.F.R. § 404.1529(b). The existence of such an impairment must be demonstrated by objective medical evidence. *Id.* Second, once an underlying impairment that could reasonably be expected to produce the individual's symptoms has been shown, the ALJ must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which they limit the individual's ability to perform basic work activities. 20 C.F.R. § 404.1529(c). This determination requires the ALJ to assess the credibility of the individual's statements about symptoms and their functional effects, i.e., the degree to which those statements can be believed and accepted as true. 20 C.F.R. § 404.1529(c)(4); SSR 96-7p, 1996 WL 374186, at *2, 4. An important indication of the credibility of an individual's statements is their consistency, both internally and with other information in the record. SSR 96-7p, 1996 WL 374186, at *5-6; 20 C.F.R. § 404.1529(c)(4). If an individual's statements lack consistency, an ALJ should give them little weight. *See id.*

An ALJ's findings based on the credibility of the claimant are to be accorded great weight and deference, particularly since an ALJ is charged with observing a witness's demeanor and credibility. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d. 525, 531 (6th Cir. 1997) (citing *Villarreal v. Secretary of Health and Human Servs.*, 818 F.2d 461, 463 (6th Cir.1987). However, an ALJ's assessment of a claimant's credibility must be supported by substantial evidence. *See id.* (citing *Beavers v. Secretary of Health, Educ. and Welfare*, 577 F.2d 383, 386–87 (6th Cir. 1978)).

As set forth in full above, the ALJ raised ten significant inconsistencies that she found undermined the plaintiff's credibility. The ALJ discussed each inconsistency in detail with citation to the record and explained why the inconsistencies undermined the plaintiff's credibility and her allegations regarding the limiting effects of her impairments. But, that was not all of the analysis the ALJ did regarding the plaintiff's credibility. Instead, throughout her decision, the ALJ noted other inconsistencies that undermined the plaintiff's credibility. (*See e.g.*, Tr. 30-31 (noting inconsistencies between the plaintiff's testimony and allegations and the evidence of record regarding her physical impairments).) The ALJ did not merely rely on conclusory or boilerplates statements regarding the plaintiff's credibility. Instead, the ALJ wrote at length about concerns that she found undermined the plaintiff's credibility. The ALJ adequately complied with the requirements of SSR 96-7p and her credibility finding is supported by substantial evidence.

Based on the foregoing, the ALJ's decision that the plaintiff was not disabled is supported by substantial evidence on the record as a whole. Accordingly, the ALJ's decision will be affirmed.

## C.  Conclusion

In light of the foregoing, the plaintiff's Motion for Judgment on the Administrative Record will be denied and the decision of the SSA will be affirmed. An appropriate order is filed herewith.

ENTER this 11th day of September 2017.

ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE